**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | **Case No. 20-00203-01-CR-W-DGK** |
| | ) | |
| **SIMON WERTENBERGER,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## REPORT AND RECOMMENDATION

This matter is currently before the Court on Defendant Simon Wertenberger's Motion to Suppress Evidence filed on March 15, 2021. Doc. 31. The Government filed Suggestions in Opposition on April 12, 2021. Doc. 39. Defendant did not file a reply, and the time for doing so has passed. L.R. 7.0(c)(3). For the reasons set forth below, it is recommended that Defendant's motion be DENIED.

## I.     BACKGROUND

On August 26, 2020, the Grand Jury returned a three-count indictment charging Defendant Wertenberger with possession with the intent to distribute less than fifty kilograms of marijuana in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(D); possession of a firearm in furtherance of a drug trafficking crime in violation of 18 U.S.C. § 924(c)(1)(A)(i); and being a felon in possession of a firearm in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2). Doc. 11. The alleged offenses involve items discovered in a vehicle driven by Defendant after he was stopped by law enforcement in Buchanan County, Missouri. The basis for the stop and the subsequent search and seizure is the subject of Defendant's pending motion to suppress.

On June 22, 2021, the undersigned held an evidentiary hearing on Defendant's motion to suppress. Mr. Wertenberger was present and represented by counsel, Lacon Smith. The Government was represented by Assistant United States Attorneys Brad Kavanaugh and Mike Green. At the evidentiary hearing, three witnesses testified: (1) Detective Richard Woodley, (2) Deputy Dennis Yager, and (3) Sergeant Samantha Crawford. Additionally, seven exhibits were admitted into evidence:

> Gov't Exhibit 1 – Dash camera video from November 11, 2020
>
> Gov't Exhibit 2 – Buchanan County Sheriff's Dep't General Orders
>
> Gov't Exhibit 3 – Buchanan County Sheriff's Dep't Property Record
>
> Gov't Exhibit 4 – Judgment of the Full Order of Protection
>
> Gov't Exhibit 5 – Buchanan County Sheriff's Dep't Order of Protection Service Log
>
> Gov't Exhibit 6 – Buchanan County Sheriff's Dep't Notice of Attempted Service
>
> Gov't Exhibit 7 – Memorandum Ref: BOLOs for Simon Wertenberger

## II.  FINDINGS OF FACT

Based on the evidence adduced at the evidentiary hearing, the undersigned submits the following findings of fact:

1.  In July and August 2020, Detective Richard Woodley, an officer with twenty-six years of experience, was assigned to the St. Joseph Police Department's ("SJPD") Crimes Against People Unit. Tr. at 4.[1] He has been a SJPD detective for six years and mainly investigates simple assaults, violations of orders of protections, and occasionally domestic situations. Tr. at 4-5.

2.  In the summer of 2020, Stacy Wertenberger applied for and received four *ex parte* orders of protection against her estranged husband, Defendant Simon Wertenberger, from the

---

[1] "Tr." refers to the Transcript of Hearing on Motion to Suppress.  Doc. 51.

Buchanan County Circuit Court for herself and her three children. Tr. at 6-7, 81-82. Defendant is the biological father of Mrs. Wertenberger's two daughters, and the stepfather of her son. Tr. at 6, 81.

3.      The *ex parte* orders of protection prohibited Defendant from communicating with Mrs. Wertenberger and granted her full custody of the three children. Tr. at 7. In July and August 2020, there were five alleged violations of the *ex parte* orders of protection and full orders of protection by Defendant, which are discussed *infra*. Tr. at 7-11.

4.      The first alleged violation occurred on July 11, 2020. Tr. at 8-9. Mrs. Wertenberger reported she was at Taco John's, 1300 South Belt Highway, St. Joseph, Missouri when Defendant pulled up next to her and told her to stop having police come by the house. Tr. at 9, 14. Defendant then allegedly reached around under his seat and said, "You don't know how bad I want to shoot you right now." Tr. at 9.

5.      On July 27, 2020, the Buchanan County Circuit Court issued a full order of protection for Mrs. Wertenberger which awarded her full custody of the children and prohibited any contact between Mrs. Wertenberger and Defendant. Tr. at 82-85; Ex. 4. At that time, Defendant had custody of the children, which violated the court's order. Tr. at 82-83. In the full order of protection, the circuit court also directed the Buchanan County Sheriff's Department ("BCSD") to assist Mrs. Wertenberger in obtaining custody of the children. Tr. at 65, 85; Ex. 4.

6.      On that same date, the second alleged violation occurred. Tr. at 9, 82-85. Defendant allegedly contacted Mrs. Wertenberger via Facebook video chat message, which she answered because Defendant still had custody of their children. Tr. at 9. During their conversation, Defendant allegedly asked Mrs. Wertenberger how court went, made a hand gesture

similar to that of a gun, and said something to the effect of "I'll start with your son first."  Tr. at 9-10.

7.    The third alleged violation occurred on August 1, 2020, at the St. Joseph Rec Center, 2700 Southwest Parkway, St. Joseph, Missouri.  Tr. at 10.  Mrs. Wertenberger reported she was at the Rec Center to pick up her son when Defendant exited his vehicle and began walking toward her.  Tr. at 10.  Mrs. Wertenberger felt compelled to lock her door and roll up her window.  Tr. at 10.  Defendant allegedly told her, "I'll smoke you and your son."  Tr. at 10.

8.    The fourth alleged violation occurred on August 8, 2020, at the South Belt Highway Walmart.  Tr. at 10, 16-17.  Mrs. Wertenberger reported that Defendant was at Walmart to relinquish custody of the older child to her, but he continued to keep custody of the younger child.  Tr. at 10.  Mrs. Wertenberger called the SJPD at 10:41 p.m., reporting Defendant's contact with her two hours prior.  Tr. at 17-18.

9.    The fifth alleged violation occurred on August 9, 2020, when Mrs. Wertenberger claims Defendant sent her ten to twelve video messages.  Tr. at 11, 20.

10.    All five alleged violations were assigned to Detective Woodley with the SJPD to investigate.  Tr. at 11.  At no point in his investigation did Detective Woodley speak with Mrs. Wertenberger or obtain evidence or records to corroborate her allegations against Defendant.  Tr. at 14-17, 20.

11.    Based on his investigation, Detective Woodley believed each incident violated the orders of protection.  Tr. at 11.  He prepared a probable cause statement for each instance and requested an arrest warrant for Defendant.  Tr. at 11, 21-22.

12. The SJPD issued three separate BOLOs[2] for Defendant on July 28, August 2, and August 9, 2020[3] for the alleged violations that previously transpired. Tr. at 12-13; Ex. 7. The BOLOs requested law enforcement agencies to arrest Defendant regarding the investigation of the violations of the orders of protection. Tr. at 13. The July 28, 2020 BOLO, which was issued in response to the alleged incident that occurred on July 27, 2020, also stated Defendant may have his two daughters with him. Tr. at 13.

13. Sergeant Samantha Crawford has worked with the BCSD for over thirty-two years. Tr. at 78-79. She currently directs civil process, transport, and warrants for the department. Tr. at 79. She is responsible for serving papers, such as eviction papers, *ex parte* orders, notices of hearings, full orders of protection, and probate warrants. Tr. at 34, 79.

14. During the summer of 2020, Sergeant Crawford was asked to serve Defendant with the four *ex parte* orders of protection entered against him. Tr. at 79, 84-85; Ex. 4. During the sergeant's attempts to locate and serve Defendant, she contacted Mrs. Wertenberger who advised her that Defendant was not employed and often drove rental vehicles. Tr. at 80.

15. After the full order of protection was entered on July 27, 2020, Mrs. Wertenberger also reported to Sergeant Crawford that Defendant continued to keep custody of the children. Tr. at 82-83. Sergeant Crawford testified that Defendant's custody of the children constituted a violation of the full order of protection. Tr. at 82-83.

16. Between July 28, 2020, and August 11, 2020, the BCSD civil process department attempted to serve Defendant with the July 27, 2020 full order of protection on ten occasions

---

[2] BOLO stands for "be on the lookout for" and typically includes a suspect's height, weight, what the incident is, when they were last seen, and if applicable, a request to pick up and hold. Tr. at 11-12.

[3] There was no BOLO issued for the incidents that allegedly took place on July 11, or August 8, 2020. *See* Tr. at 12-13.

without success. Tr. at 86-89; Ex. 5. After every unsuccessful contact attempt, Sergeant Crawford left a form in the door at the house identified as Defendant's residence on the full order of protection, indicating her desire to speak with the resident. Tr. at 90-91; Ex. 6.

17. On August 11, 2020, Sergeant Crawford asked Deputies Leonard Hill and Dennis Yager[4] for assistance in locating and serving Defendant with the July 27, 2020 order of protection and obtaining custody of the children. Tr. at 34-35, 37, 74, 87, 91-92. Sergeant Crawford provided Deputy Yager with the address listed for Defendant on the July 27, 2020 full order of protection: 3206 North Woodbine Road, Apartment B. Tr. at 34-36, 64-65; Ex. 4.

18. She also informed Deputy Yager that Defendant often drove rental vehicles. Tr. at 64. She explained to the deputies that the court order included a request to the sheriff's department to assist with obtaining custody of the children and returning them to their mother. Tr. at 65, 74.

19. On August 11, 2020, Deputy Yager was not aware of the SJPD police reports or probable cause statements. Tr. at 65. He was also not aware of the BOLOs being issued for Defendant. Tr. at 72. Deputy Yager was not advised of any of the underlying circumstances or claims leading up to the *ex parte* orders. Tr. at 65. He had no knowledge of any threats made by Defendant and was not aware of any emergency situation indicating Defendant posed an ongoing or imminent threat to the children. Tr. at 65-66.

20. At approximately 10:44 a.m. on August 11, 2020, Deputies Yager and Hill[5] went to the area of 3206 North Woodbine Road. Tr. at 36-37. They were in a marked patrol vehicle for the BCSD, which was equipped with a working dash camera.[6] Tr. at 37.

---

[4] Deputy Yager has been employed by the BCSD for six years. Tr. at 31. He typically works calls for service but also has specialized training with interdiction through the Missouri State Highway Patrol. Tr. at 31-32.

[5] Deputy Hill did not testify at the suppression hearing.

[6] During the hearing, the August 11, 2020 dash camera footage was admitted into evidence as Government's Exhibit 1. Tr. at 38; Ex. 1.

6

21.     As the deputies neared 3206 North Woodbine Road, they observed the garage door opening.  Tr. at 38-39, 40, 66.  Deputy Hill pulled the patrol vehicle into a driveway approximately four or five houses away and watched a white SUV pull out of the garage and drive by the deputies.  Tr. at 39-40, 66; Ex. 1 at 10:42:02.[7]  According to Deputy Yager, the SUV had an out-of-state license plate, and he observed the driver as being a white male.[8]  Tr. at 62, 66-67.

22.     Deputy Yager did not positively identify the driver, and he was not aware if Defendant was driving the vehicle.  Tr. 40-41.  According to Deputy Yager, the deputies were not aware if there were any passengers, including children, in the vehicle at the time of the initial stop.  Tr. at 68.

23.     Deputy Hill activated his patrol vehicle lights and sirens to attempt a traffic stop.[9]  Tr. at 42; Ex. 1 at 10:42:54.  The SUV pulled over to a stop, and Deputy Hill observed the vehicle's driver was "moving around a lot."  Tr. at 42, 67; Ex. 1 at 10:43:00.

24.     Deputy Yager attempted to contact Sergeant Crawford over the radio, so she could respond to serve Defendant with the full order of protection.  Tr. at 44; Ex. 1 at 10:43:44.

25.     As he approached the stopped SUV, Deputy Yager saw what he believed to be a car seat in the backseat and the top of a small child's head.  Tr. at 44; Ex. 1 at 10:44:09.  Deputy Yager also smelled a strong odor of marijuana coming from the vehicle.  Tr. at 45, 69-70.

26.     Deputy Hill passed Deputy Yager the license he obtained from the driver, which bore the name Simon Wertenberger.  Tr. at 45; Ex. 1 at 10:44:21.  Deputy Yager communicated over the radio with Deputy Josh Rudisill who advised Defendant is known for 99, which is code

---

[7] References to the dash camera footage shall refer to the time counter at the top of the video contained within Exhibit 1.  Tr. at 41.

[8] Deputy Yager initially testified he could not identify who was driving the vehicle.  Tr. at 40-41.  However, upon refreshing his recollection with his report, Deputy Yager confirmed he observed a white male driver.  Tr. at 62.

[9] The dash camera footage does not have sound until Deputy Hill activated his lights and sirens.  Tr. at 42.

7

for drugs.  Tr. at 45-46; Ex. 1 at 10:45:17.  Deputy Yager responded via radio that they already had it as he had already smelled the strong odor of marijuana coming from the vehicle.  Tr. at 46; Ex. 1 at 10:45:20.

27.    Deputy Yager asked dispatch to contact Sergeant Crawford to have her respond to the location with the full order of protection.  Tr. at 46-47; Ex. 1 at 10:47:26.  When he spoke with Sergeant Crawford, Deputy Yager advised her that they could smell marijuana from the vehicle.  Tr. at 48; Ex. 1 at 10:48:22.

28.    The deputy requested Defendant's criminal history from dispatch.  Tr. at 47-48; Ex. 1 at 10:48:53.  He also provided dispatch with the Indiana license plate number and its expiration date – April 2028.  Tr. at 48; Ex. 1 at 10:50:20.  Deputy Yager asked dispatch to contact the "female subject," in reference to Mrs. Wertenberger, as there was one child in the car.  Tr. at 48-49; Ex. 1 at 10:51:25.

29.    Deputy Yager walked to the driver's side of the vehicle and requested consent to take a picture of the vehicle's VIN located on the inside doorframe.  Tr. at 49-50, 70; Ex. 1 at 10:54:38.  The deputy was granted permission by Defendant, so he opened the door and took a picture of the VIN.  Tr. at 49-50; Ex. 1 at 10:54:41.

30.    As he bent down to take a picture of the VIN, the deputy saw a small, clear plastic bag containing marijuana on the floorboard near the door.  Tr. at 50, 70; Ex. 1 at 10:54:43.

31.    After relaying the VIN number to dispatch, Deputy Yager was advised the vehicle was registered to a rental car company.  Tr. at 51; Ex. 1 at 10:57:20. He was also told the Indiana-issued plate was not in Defendant's name.  Tr. at 49, 67.

32.    Sergeant Crawford contacted the Comm. Center on her way to the traffic stop and confirmed the BOLOs issued by the SJPD were still in effect.  Tr. at 94-95.  She also confirmed

the location of the traffic stop over the radio and arrived shortly thereafter.  Tr. at 52, 69; Ex. 1 at 11:04:31.

33.     Sergeant Crawford and Deputy Yager discussed, off camera and at the rear of the patrol vehicle, arresting Defendant for violations of the *ex parte* orders or the marijuana.  Tr. at 53, 94; Ex. 1 at 11:06:26.  Sergeant Crawford advised the deputy the SJPD had an ongoing investigation into Defendant's alleged violations of the *ex parte* orders.  Tr. at 53, 94; Ex. 1 at 11:06:23.

34.     Deputy Hill escorted Defendant from the vehicle to the front of the patrol car.  Tr. at 53-54; Ex. 1 at 11:06:23.  As Deputy Yager began a frisk of Defendant's person, Sergeant Crawford asked Defendant where the other child was.  Tr. at 54; Ex. 1 at 11:07:00.  Defendant responded that the other child was with the child's mother.  Tr. at 54; Ex. 1 at 11:07:03.

35.     Deputy Yager continued his frisk of Defendant and discovered a pack of Newport cigarettes.  Tr. at 54; Ex. 1 at 11:07:12.  As he placed the pack of cigarettes on the hood, the deputy observed a partially smoked marijuana joint cigarette.  Tr. at 54; Ex. 1 at 11:07:13.

36.     Deputy Yager advised Defendant he was under arrest for the investigation of possession of marijuana, and Defendant subsequently fled on foot.  Tr. at 54; Ex. 1 at 11:07:22.  Both deputies commanded Defendant to stop, but he refused.  Tr. at 55-56; Ex. 1 at 11:07:49.  Defendant was later apprehended by SJPD officers and other Buchanan County deputies.  Tr. at 55-56.

37.     Upon returning to the patrol vehicle, the deputies decided to have Defendant's vehicle towed because it was a traffic hazard where it was positioned in the road, and no other responsible adult was present to drive it.  Tr. at 56-57, 73, 75.

9

38.     Before the vehicle was towed, the deputies, pursuant to BCSD policy, were required to inventory anything of value and detail the items on the tow report.  Tr. at 57, 75; Ex. 2.

39.     Deputy Yager searched underneath the driver's seat and observed the barrel of a silver and black handgun.  Tr. at 59; Ex. 1 at 11:30:02.  Upon further investigation, the deputy discovered a round loaded in the handgun's chamber.  Tr. at 59-60; Ex. 1 at 11:32:16.

40.     The deputies also discovered two large black garbage bags in the back of the vehicle.  Tr. at 60.  One bag contained five clear, plastic vacuum-sealed bags containing marijuana, and the other contained four vacuum-sealed bags of marijuana.  Tr. at 60; Ex. 1 at 11:40:17.  All items seized from the vehicle were documented in a property record.  Tr. at 60-61; Ex. 3.

### III.     DISCUSSION

Defendant seeks to suppress all evidence from the search of his person and vehicle on August 11, 2020.  Doc. 31 at 1-3.  Defendant argues the seizure and subsequent search violated his Fourth Amendment rights because law enforcement conducted a traffic stop without reasonable suspicion that criminal activity was afoot.  Doc. 31 at 2.  He contends he did not commit a crime or a traffic infraction prior to the traffic stop, thus dispelling any reasonable suspicion law enforcement may claim.  *Id*. at 2-3.

The Fourth Amendment specifically provides, "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . ."  U.S. Const. amend. IV.  To protect citizens from unwarranted government intrusion, the Fourth Amendment's reasonableness requirement generally "obligates law enforcement officers to obtain a judicial warrant, issued only on a showing of probable cause, before conducting a search."  *See*, *e.g.*, *Shade v. City of Farmington*, 309 F.3d 1054, 1059 (8th Cir. 2002).  "[S]earches conducted outside the judicial process, without prior approval by judge or magistrate, are per se

unreasonable under the Fourth Amendment – subject only to a few specifically established and well-delineated exceptions." *Katz v. United States*, 389 U.S. 347, 357 (1967) (internal footnotes omitted); *see also Arizona v. Gant*, 556 U.S. 332, 338 (2009).

It is well established that a traffic stop of a motor vehicle constitutes a seizure under the Fourth Amendment. *Delaware v. Prouse*, 440 U.S. 648, 653 (1979); *see also United States v. Chartier*, 772 F.3d 539, 543 (8th Cir. 2014). To that end, most warrantless traffic stops are justified under the Fourth Amendment if the police have probable cause to believe a traffic violation has occurred. *See Whren v. United States*, 517 U.S. 806, 810 (1996); *United States v. Espinoza*, 885 F.3d 516, 522-23 (8th Cir. 2018).

In this case, the Government does not contend the stop was the result of any traffic offense or violation. Instead, the Government argues the community caretaking exception to the Fourth Amendment warrant requirement justified the stop of the vehicle to obtain custody of the child as provided for in the full order of protection. Alternatively, the Government contends the detaining officers had probable cause to believe Defendant violated the order of protection, thus justifying the traffic stop. Both arguments are addressed below.

### A. Community Caretaking Exception

"Our circuit has recognized, under the 'community caretaker' classification, that noninvestigatory searches and seizures may be justified in certain limited situations." *Luer v. Clinton*, 987 F.3d 1160, 1165-66 (8th Cir. 2021) (quoting *United States v. Harris*, 747 F.3d 1013, 1017 (8th Cir. 2014)). "Actions within [the] heartland of the community caretaker exception includes those taken to ... provide an infinite variety of services to preserve and protect community safety." *Luer*, 987 F.3d at 1166 (quoting *Castagna v. Jean*, 955 F.3d 211, 221 (1st Cir.), *cert.*

*denied*, 141 S. Ct. 896 (2020)). "The scope of the encounter must be carefully tailored to satisfy the purpose of the initial detention." *Harris*, 747 F.3d at 1017.

"A search or seizure under the community caretaking function is reasonable if the governmental interest in law enforcement's exercise of that function, based on specific and articulable facts, outweighs the individual's interest in freedom from government intrusion." *United States v. Smith*, 820 F.3d 356, 360 (8th Cir. 2016) (quoting *Harris*, 747 F.3d at 1017). Most decisions involving the community caretaking exception have involved police responding to an emergency situation. Law enforcement officers may act under the community caretaker doctrine to respond to potential emergencies if (1) they have a reasonable belief that an emergency exists requiring his or her attention, and (2) their response is carefully tailored to address the emergency. *United States v. Halter*, 988 F.3d 1042, 1046 (8th Cir. 2021).

Likewise, when law enforcement "must make a split-second decision in the face of an emergency to either stand idly by, permitting a dangerous situation to continue uninterrupted, or act, addressing the potential danger to protect the public, we have reasoned that officers are expected to act." *Harris,* 747 F.3d at 1017-18 (citations omitted). To determine whether the officer had a "reasonable belief" that an emergency existed, courts examine "the facts known to the officer at the time of the decision" to stop the individual and/or enter the property. *United States v. Parks*, 902 F.3d 805, 812-13 (8th Cir. 2018).

This past term, the United States Supreme Court rejected the application of the "community caretaking" exception for warrantless entries into a home. *Caniglia v. Strom*, 141 S. Ct. 1596, 1599 (2021). The majority opinion discussed at length its prior decision in *Cady v. Dombrowski,* 413 U.S. 433, 441 (1973), in which the Court upheld a warrantless search of an impounded vehicle. *Caniglia,* 141 S. Ct. at 1598. The *Caniglia* Court observed that in reaching its decision in *Cady*,

12

it discussed that police officers are often called upon to discharge noncriminal "community caretaking" functions such as responding to disabled vehicles or investigating accidents. *Id.*

The Court indicated its acknowledgement of caretaking duties in *Cady* was not meant to create a standalone doctrine that justified a warrantless search and seizure of the home. *See id.* at 1598. The Court wrote, "this recognition [in *Cady*] that police officers perform many civic tasks in modern society was just that—a recognition that these tasks exist, and not an open-ended license to perform them anywhere." *Id.* at 1599-1600. Although the *Caniglia* holding was expressly limited to warrantless searches of a home, a fair reading of the opinion calls into question whether community caretaking is a standalone exception to the Fourth Amendment warrant requirement in those circumstances beyond the search of a home.

In the instant matter, the Government has not provided sufficient evidence to establish the deputies' actions were permitted under the community caretaker exception. The Government argues the deputies were acting within their capacity to enforce the full order of protection by providing assistance in obtaining custody of the child. However, the Government did not provide any authority to support this argument. As discussed below, the Government's attempt to expand the breadth of the community caretaking function is improper based on the facts of this case.

Deputy Yager testified about the circumstances, or lack thereof, known to him at the time of the traffic stop. The Government claims the deputies were attempting to obtain custody of the child pursuant to the full order of protection entered by the Buchanan County Circuit Court. But there is no evidence demonstrating the deputies knew, or had reason to believe, the child would be in the car when they pulled it over. In fact, Deputy Yager testified he was not aware if any passengers were in the car at the time of initial stop. It was not until after the vehicle was stopped

and the deputies approached the vehicle that they saw a car seat and what appeared to be the top of a child's head.

The Government cited *United States v. Halter*, 988 F.3d 1042, 1046 (8th Cir. 2021), to suggest the community caretaking exception allows a warrantless seizure of a vehicle to conduct a welfare check of a child.  Doc. 39 at 9 (citation omitted).  But the facts in *Halter* are distinguishable from the instant case.  In *Halter*, a mother was on the phone with the father of her child when she heard her four-year-old daughter screaming and crying in the background.  988 F.3d at 1046.  She reported to law enforcement that the father had a firearm and threatened to shoot law enforcement or anybody else that tried to come get the child.  *Id.* at 1045.  When law enforcement responded to the scene, officers observed a vehicle leaving from the direction of the father's home.  *Id*. As they pursued this vehicle, the driver, later identified as the father, accelerated from the police but then parked on the side of the road.  *Id.*  When the officers called out to the father, he threatened the officers and refused further police commands.  *Id.*  Based on these facts, the Eighth Circuit found the officers were justified under the community caretaking exception to respond to the potential emergency and had a reasonable concern about the child's safety and well-being.  *Id*. at 1046.

Unlike *Halter*, the detaining deputies in the instant matter were not privy to any emergency situation prior to the initial traffic stop.  The deputies were not advised of any facts suggesting Defendant had threatened the children or presented an imminent risk to their safety or well-being.  Instead, the deputies had been asked to assist in serving the full order of protection.  They also knew that the state court had ordered the children be returned to the custody of their mother and BCSD to assist in that process.

Although it is reasonable to assume the circuit court was presented with evidence to justify the custody decision when issuing the full order of protection, the detaining deputies were simply unaware of the underlying evidence or the particular facts. Deputy Yager confirmed he was not aware of any emergency situation related to the children. Based on the deputies' limited factual information, they did not have a "reasonable belief" that an emergency existed, permitting them to stop the vehicle under a community caretaking exception to the warrant requirement. *See Parks*, 902 F.3d at 813.

In a footnote, the Government also cites a concurring opinion in *Commonwealth v. Sanborn*, 77 N.E.3d 274, 278 (Mass. 2017) (Gants, concurring), to suggest the numerous unsuccessful efforts to serve Defendant with the full order of protection "might have been sufficient to justify a stop of the vehicle" under the community caretaking doctrine. Doc. 39 at 9 n.3. The Government did not, however, address the majority opinion in *Sanborn*, which held the state civil abuse statutes did *not* authorize the police to effectuate a motor vehicle stop simply to serve a civil abuse prevention order. 77 N.E.3d at 276-77. Instead, the majority opinion states the civil abuse statutes do not authorize a traffic stop absent a constitutional justification, such as a warrant, reasonable suspicion of criminal activity, a traffic violation or a reasonable belief that an emergency intervention is required. *Id.*

The issuance of a full order of protection is an important function of the state judicial system. When an order is issued that requires the return of the custody of children and requests law enforcement assistance in that process, the duties of the police are important and well-justified. However, based on the record before the Court, the facts as known to the detaining officers and the BCSD did not rise to the level of demonstrating a "reasonable belief" that an emergency or exigency existed that would justify a warrantless stop of a vehicle under the community caretaking

exception. Accordingly, the undersigned recommends a finding that the community caretaking exception does not apply to the facts of this case and does not provide a basis for upholding the initial traffic stop.

### B. Alleged Violations of the Full Order of Protection

In Missouri, if a person fails to surrender custody of a minor child pursuant to an order of protection directing custody exchange, law enforcement "shall arrest" the person and turn the minor children over to the awardee of custody. Mo. Rev. Stat. § 455.085.5. A person's first offense for violating an order of protection is a Class A misdemeanor. Mo. Rev. Stat. § 455.085.2. The Government argues that since there was probable cause to believe Defendant had maintained custody of the children in violation of the order of protection, the deputies were justified in conducting the traffic stop of the vehicle that left the location identified as Defendant's residence in the full order of protection. Doc. 39 at 10-11.

"A traffic stop is a seizure and 'must be supported by reasonable suspicion or probable cause.'" *United States v. Houston*, 548 F.3d 1151, 1153 (8th Cir. 2008). The more rigorous standard of probable cause exists when the totality of the circumstances justifies a belief that a crime has been committed and the person seized committed it. *Id*. Most warrantless traffic stops are justified under the Fourth Amendment based on a probable cause to believe that a traffic violation occurred. *See*, *e.g.*, *Whren*, 517 U.S. at 810. In such cases, any traffic violation, however minor, provides probable cause for the traffic stop. *United States v. Bloomfield*, 40 F.3d 910, 915 (8th Cir. 1994).

The Government does not suggest there was a traffic violation that provided probable cause to stop the vehicle. Instead, it contends the stop of the SUV was justified because the officers had probable cause to believe Defendant violated the order of protection by continuing to have custody

of the minor children who were ordered to be returned to their mother. The Government's argument, however, fails to address whether the detaining officers had probable cause to stop the vehicle in question. The initial stop of the vehicle must be analyzed because the detaining officers were not aware of the identity of the driver or whether Defendant would be present therein when they initiated the traffic stop. The question to be addressed is whether the detaining officers had reasonable and articulable grounds to conduct an investigative stop of the vehicle.

Under the Fourth Amendment, a motor vehicle and its occupants are subject to *Terry*[10] investigative stops. *See United States v. Cortez*, 449 U.S. 411, 417 (1981) (recognizing the Fourth Amendment applies to seizures of persons, including brief investigatory stops of vehicles). An investigative stop of a vehicle will not violate the Fourth Amendment if law enforcement has reasonable suspicion that the vehicle or its occupants were involved in a previously committed crime, are currently involved in criminal activity, or are about to commit a crime. *United States v. Bell*, 183 F.3d 746, 749 (8th Cir. 1999); *United States v. Hensley*, 469 U.S. 221, 227, 232 (1985); *see also United States v. Mora-Higuera*, 269 F.3d 905, 909 (8th Cir. 2001) ("There is no requirement that there be a traffic violation" to conduct a *Terry* stop). The United States bears the burden of establishing a traffic stop complied with the Fourth Amendment. *United States v. Adler*, 590 F.3d 581, 583 (8th Cir. 2009).

"Reasonable suspicion is a 'particularized and objective' basis for suspecting criminal activity by the person who is stopped." *United States v. Bustos-Torres*, 396 U.S. 935, 942 (8th Cir. 2005). Whether the facts known to the officer amounted to an objective and particularized basis for a reasonable suspicion of criminal activity is determined in light of the totality of the circumstances. *Id.* The level of suspicion required for reasonable suspicion is considerably less

---

[10] *Terry v. Ohio*, 392 U.S. 1, 9 (1968).

than proof of wrongdoing by a preponderance of the evidence, and obviously less than is necessary for probable cause. *Kansas v. Glover*, 140 S. Ct. 1183, 1187 (2020).

Because it is a less demanding standard, reasonable suspicion can be established with information that is different in quantity or content than that required to establish probable cause. *Id.* at 1188. The concept of reasonable suspicion, like probable cause, is not "readily, or even usefully, reduced to a set of legal rules." *United States v. Sokolow*, 490 U.S. 1, 7 (1989) (citation omitted). The standard depends on the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act. *Glover*, 140 S. Ct. at 1188 (quotations and citations omitted). The reasonable suspicion inquiry allows officers to draw inferences and rely on probabilities. *Id.* at 1188-90.

In this case, Sergeant Crawford advised the deputies of the existence of the full order of protection, and Defendant was in violation of that order by maintaining ongoing custody of the children. She also provided them the address for Defendant, told them Defendant drove rental cars, and informed them that she had attempted to serve the full order of protection on multiple occasions without success. When the detaining deputies arrived in the area, they saw a vehicle with an out-of-state license plate leave the garage of Defendant's home.[11] As the SUV drove by where the officers were parked, Deputy Yager observed a white male driving.

Based on the totality of the circumstances and objective facts, the deputies had a reasonable suspicion that Defendant could be driving the vehicle in question or be present within. Therefore, it was reasonable for the deputies to conduct a brief, investigatory stop to determine if Defendant was driving the vehicle or present therein and inquire about the custody of the children at issue in the full order of protection. If Defendant had custody of the children in violation of the order,

---

[11] A reasonable inference can be drawn that an out-of-state license plate could be a rental car.

18

Missouri law allows that person to be arrested and to be prosecuted criminally for violating the order of protection. It was reasonable for the deputies to conduct a brief, investigative stop in this instance.

The fact that the deputies did not confirm the particular identity of the driver, or if Defendant was present in the vehicle at the point of the initial stop, does not invalidate the investigative stop of the SUV. Here, the deputies were entitled to rely on reasonable inferences that Defendant could either be driving or present in the vehicle that had just left his house. *See Glover*, 140 S. Ct. at 1190 (holding an officer may rely on the probability that the truck's registered owner was driving his own vehicle after a license plate check of the truck revealed its owner had a suspended license); *United State v. Gonzalez-Zea*, 995 F.3d 1297 (11th Cir. 2021) (finding officers had a specific, articulable basis for a vehicle stop when they observed an unidentified male leaving a house in the pre-dawn hours that recently had utilities connected using a fugitive's social security number); *see also United States v. Black-McCormick*, No. 12-00363-14-CR-W-DGK, 2014 WL 7005189, *4 (W.D. Mo. Dec. 10, 2014). The "ultimate touchstone of the Fourth Amendment is 'reasonableness.'" *Glover*, 140 S. Ct. at 1191 (citation omitted).

Here, the deputies were advised that Defendant had custody of his children in violation of the full order of protection. They were also told where Defendant lived and that he often drove rental vehicles. When they observed an SUV with an out-of-state plate leave Defendant's residence, the officers reasonably drew an inference and/or relied on the probability that Defendant was driving the vehicle, or he was a passenger in the vehicle. Under the totality of the circumstances, including objective facts known to the detaining officers and the BCSD, it was reasonable for the officers to conduct a brief, investigative stop of the vehicle to investigate Defendant's ongoing custody of the children and the violation of the full order of protection.

19

The Government also adduced significant evidence at the suppression hearing about an investigation being conducted by the SJPD regarding prior violations of the full order of protection and the issuance of BOLOs. Prior to the stop on August 11, 2020, the SJPD issued three separate BOLOs for Defendant. Ex. 7. If a police flyer or bulletin was issued based on articulable facts supporting reasonable suspicion that the wanted person committed an offense, then reliance on that flyer or bulletin would justify a *Terry* stop to check identification, pose questions, or detain the person briefly while attempting to obtain further information. *United States v. Jacobsen*, 391 F.3d 904, 906 (8th Cir. 2004).

There was no evidence or testimony that the detaining deputies were aware of the SJPD investigation, the SJPD's probable cause statements, or the BOLOs issued for Defendant. However, Sergeant Crawford was aware of the BOLOs prior to the traffic stop and further confirmed they were in effect prior to her arrival at the stop location. Her knowledge of the BOLOs further supports a finding of reasonable suspicion. *See United States v. Guzman*, 926 F.3d 991, 997 (8th Cir. 2019) (recognizing an officer may rely on information provided by other officers as well as information known to the team of officers conducting the investigation). For all the foregoing reasons, the undersigned recommends a finding that the initial traffic stop of the vehicle was supported by reasonable suspicion and reasonable under the Fourth Amendment.

### C. Search of Defendant's Vehicle

Defendant challenges the subsequent search of his vehicle, asking this Court to suppress all evidence discovered as "fruits of the poisonous tree." Doc. 31 at 3-4. As the undersigned has recommended a finding that the initial traffic stop was supported by reasonable suspicion, the items discovered and seized need not be suppressed under the exclusionary rule. *See United States v. Tuton*, 893 F.3d 562, 568 (8th Cir. 2018) (internal citations and quotation marks omitted)

(holding the exclusionary rule "extends to evidence later discovered and found to be derivative of an illegality or 'fruit of the poisonous tree.'").  Furthermore, as discussed below, the search of Defendant's vehicle after the initial traffic stop was reasonable under the Fourth Amendment.

An exception to the warrant requirement of the Fourth Amendment, long recognized by the Court, is the automobile exception.  *United States v. Keck*, 2 F.4th 1085, 1089 (8th Cir. 2021).  "Probable cause to believe that an automobile contains contraband or evidence of criminal activity has long been held to justify a warrantless search of the automobile and seizure of the contraband."  *United States v. Shackleford*, 830 F.3d 751, 753 (8th Cir. 2016).  Probable cause exists where there is a "fair probability that contraband or evidence of a crime will be found in a particular place."  *Illinois v. Gates*, 462 U.S. 213, 238 (1983).

It is well established that the odor of marijuana emanating from a vehicle during a proper traffic stop gives an officer probable cause to search for drugs.  *United States v. Merrett*, ___ F.4th ___, 2021 WL 3483314 at *5 (8th Cir. Aug. 9, 2021); *United States v. Williams*, 955 F.3d 734, 737 (8th Cir. 2020); *see also United States v. Smith*, 789 F.3d 923, 928-29 (8th Cir. 2015).  Moreover, if probable cause exists to justify a search, "it justifies the search of every part of the vehicle and its contents that may conceal the object of the search."  *United States v. Bettis*, 946 F.3d 1024, 1030 (8th Cir. 2020) (quoting *United States v. Ross*, 456 U.S. 798, 825 (1982)); *see also United States v. Murillo-Salgado*, 854 F.3d 407, 418 (8th Cir. 2017).

Here, Deputy Yager testified he smelled marijuana emanating from Defendant's vehicle at the time of the initial traffic stop.  This alone provides probable cause to search the vehicle and its contents.  Additionally, he testified he observed a small plastic bag containing what he believed to be marijuana under the seat when he opened the door, with Defendant's consent, to take a picture of the VIN.  The facts of this case provided the deputies with a fair probability that contraband or

evidence of a crime would be discovered. Accordingly, the undersigned recommends a finding that the warrantless search of Defendant's vehicle was supported by probable cause and permissible under the automobile exception to the warrant requirement.

Even absent the smell of marijuana, the deputies had probable cause to search under the "plain view" exception to the warrant requirement. The plain view doctrine allows police officers to seize evidence without a warrant when "the officers are lawfully in a position from which they view the object, the incriminating character of the object is immediately apparent, and the officers have a lawful right of access to the object." *United States v. Smith*, 990 F.3d 607, 612 (8th Cir. 2021) (quoting *United States v. Evans*, 830 F.3d 761, 766 (8th Cir. 2016)).

The deputy did not violate the Fourth Amendment when he opened Defendant's door. The evidenced established Defendant consented to Deputy Yager opening the door of the vehicle to take a picture of the VIN. While bending down next to the car, the deputy observed a small clear bag containing what he believed was marijuana in between the doorframe and the seat. This evidence was plainly viewed, and its incriminating nature was immediately apparent to the deputy. For these reasons, the undersigned recommends a finding that the subsequent search of Defendant's vehicle was supported by probable cause and was reasonable under the Fourth Amendment.[12]

---

[12] There was also evidence presented at the evidentiary hearing regarding BCSD's tow policy in effect on the date of the traffic stop. Because the undersigned has recommended a finding that the search of Defendant's vehicle was proper under the automobile and plain view exceptions, the merits of the inventory search analysis need not be addressed. However, to the extent necessary, sufficient evidence was adduced to support a finding that the tow policy justified an inventory search of his vehicle. *See United States v. Williams*, 777 F.3d 1013, 1015 (8th Cir. 2015) ("It is well-settled law that a police officer, after lawfully taking custody of an automobile, may conduct a warrantless inventory search of the property to secure and protect vehicles and their contents within police custody.") Furthermore, the Eighth Circuit recently found inventory searches to be reasonable "if it is conducted according to standardized police procedures" because doing so "vitiate[s] concerns of an investigatory motive or excessive discretion." *United States v. Green*, 929 F.3d 989, 992 (8th Cir. 2019).

## IV. CONCLUSION

Based on the foregoing, it is

RECOMMENDED that the Court, after making an independent review of the record and applicable law, enter an order DENYING Defendant's Motion to Suppress. Doc. 31.

Counsel are reminded they have fourteen days in which to file any objections to this Report and Recommendation. A failure to file and serve objections by this date shall bar an attack on appeal of the factual findings in this Report and Recommendation except on the grounds of plain error or manifest injustice.


DATE:    August 10, 2021                              /s/ W. Brian Gaddy
                                                  W. BRIAN GADDY
                                                  UNITED STATES MAGISTRATE JUDGE

23